IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MARLENA Y. BALTAZAR                                    PLAINTIFF

V.                              NO. 12-2273

CAROLYN W. COLVIN,[1]
Acting Commissioner of the Social Security Administration          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Marlena Y. Baltazar, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for a period of supplemental security income (SSI) under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

## I.     Procedural Background:

Plaintiff received SSI benefits based on disability as a child. (Tr. 10). As indicated by the ALJ, as required by law, eligibility for these disability benefits was redetermined under the rules for determining disability in adults when the claimant attained age 18. Consequently, on September 2, 2009, it was determined that Plaintiff was no longer disabled as of September 1, 2009. (Tr. 10). An administrative hearing was held on July 7, 2011, at which Plaintiff appeared with counsel and testified. (Tr. 27-62).

_____

[1]Carolyn W. Colvin, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

-1-

By written decision dated October 26, 2011, the ALJ determined that since September 1, 2009, Plaintiff had the following severe impairments: rheumatoid arthritis, migraines, seizure disorder, tachycardia, a history of asthma, cognitive disorder, not otherwise specified, mood disorder/depression and anxiety disorder. (Tr. 12). However, the ALJ held that since September 1, 2009, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 12). The ALJ found that since September 1, 2009, Plaintiff had the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 416.967(a) except that she must avoid even moderate exposure to temperature extremes, humidity, fumes, odors, dusts, gases and poor ventilation. The claimant must also avoid all exposure to hazards, including driving as a part of work. In addition, the claimant is able to perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment involved, and the supervision required is simple, direct and concrete.

(Tr. 15). With the help of a vocational expert (VE), the ALJ determined that since September 1, 2009, there were jobs Plaintiff could perform, such as assembly worker (fishing reel assembler), lamp shade assembler, and clerical worker. (Tr. 20).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on October 24, 2012. (Tr. 1-4). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 12, 14).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

-2-

**II.     Evidence Presented:**

Plaintiff was born in 1991, and completed grade 12. (Tr. 31, 171). In late 2002, Plaintiff underwent brain surgery to remove a pineal gland tumor. (Tr. 536).  Subsequent thereto, up through May of 2011, MRI's of her brain revealed no evidence of recurrent or residual cranial tumor. (Tr. 363, 525, 529-530, 532-535, 704).

On January 26, 2005, a MRI of Plaintiff's right lower leg revealed a subtle induration and edema of the subcutaneous fat of the pretibial distal shin. (Tr. 531).

On March 21, 2005, Jeffrey H. Snow, Ph.D., a pediatric neuropsychologist at the UAMS Department of Pediatrics, conducted a neuropsychological evaluation of Plaintiff. (Tr. 228-232). Dr. Snow found that Plaintiff continued to show solid average intellectual processing skills. (Tr. 229). He also found that Plaintiff continued to demonstrate problems with attention and concentration, although this was a difficulty pre-surgically. (Tr. 232). He found that Plaintiff was demonstrating difficulties with certain executive processing skills, and had problems with organizational skills. (Tr. 232). Finally, Dr. Snow found that Plaintiff was not showing any residual deficits to indicate impairment with posterior cortical systems, and he recommended that the school formulate a 504 plan for Plaintiff, stating that this was justified given her diagnosed brain tumor as well as Attention-Deficit Disorder (ADD). (Tr. 232).

On April 5, 2005, Dr. Mary Curtis, Professor at the Department of Pediatrics at UAMS, sent a letter to Dr. Stephanie Frisbie, one of Plaintiff's treating physician, reporting that it appeared there were two potential genetic conditions present in Plaintiff's case: Stickler

syndrome[2] in the family and pineocytoma[3] of the pineal gland. (Tr. 571).

On March 29, 2006, Plaintiff presented herself to St. Edward Mercy Medical Center, complaining of an anxiety attack. (Tr. 603). An electrocardiogram was within normal limits. (Tr. 603).

From May 25, 2006 to February 5, 2007, Plaintiff was seen at The Eye Group, and was thought to be getting an " ulcer OD."  By January 30, 2007, Plaintiff reported that her eye felt much better and was not as sore or light sensitive. (Tr. 574-575).

On October 15, 2008, Plaintiff presented to Arkansas Children's Hospital Orthopedic Clinic. (Tr. 255). It was reported that she was following up on her visit of August 31, 2005, where Plaintiff was diagnosed with rheumatoid arthritis. (Tr. 255). Plaintiff also presented with a new lump on her ankle. (Tr. 255).

On February 11, 2009, Dr. Richard W. Nicholas, at Arkansas Children's Hospital, saw Plaintiff, noting that Plaintiff was 17 ½ years old with rheumatoid arthritis, who had previously been seen for questionable abnormality of the right distal tibia. (Tr. 245).  Physical examination revealed  excellent range of motion of the knees and ankles. (Tr. 245). Dr. Nicholas noted a slight discoloration of the skin over the distal anterior aspect of both legs, but also noted there was no adenopathy, no erythema, no soft tissue fluctuance or soft tissue mass. (Tr. 245). Dr. Nicholas believed this was most consistent with a healed benign developmental abnormality such

---

[2]Stickler syndrome - hereditary progressive arthroophthalmopathy. Stedman's Medical Dictionary 1914 (28th ed. 2006).
Arthroophthalmopathy - Disease affecting joints and eyes. Id. at 161.

[3]Pineocytoma - A tumor arising in the pineal gland that resembles normal pineal parenchyma. Id. at 1498.

as a non ossifying fibroma.[4] (Tr. 245). Dr. Nicholas also reported that he contacted Dr. Morris'

office to talk with them regarding Plaintiff's rheumatoid arthritis. He indicated that currently,

Plaintiff was on Plaquenil and Molex, and that neither of the medications appeared to have a

significant compromising nature. (Tr. 245). He believed Plaintiff was doing well, and there was

no evidence of ongoing infection. (Tr. 245).

Also on February 11, 2009, Dr. Jason A. Ramsey, of the Orthopedic Clinic at Arkansas

Children's Hospital, saw Plaintiff for repeat evaluation of what was described as worsening bone

lesion and continual pain symptoms in her anterior tibias bilaterally. (Tr. 247).  He indicated that

he was consulted to ensure the leg lesions were not caused by any underlying bone infection that

was producing the lesions on the surrounding soft tissues. His assessment was that Plaintiff was

currently asymptomatic, with no underlying evidence of bone pathology that would be causing

the symptoms. (Tr. 248).

Plaintiff was seen by Dr. Paula Morris at Arkansas Children's Hospital, Department of

Pediatric Rheumatology, on February 11, 2009. (Tr. 249-253). The impression given was:

> 1. Tender pre-tib area, prev. MRI suggests benign cortical defect
> 2. Ankle pain since starting increased activity
> 3. Oral ulcers (episodic-usually 1-2 at a time)
> 4. Prevl (now nearly normal) increased ESR/+antibodies (ESR nearly normal now)
> 5. ACL IgM+ - non-specific (IgG much more specific)

(Tr. 250).  In general, Plaintiff was reported as improved - symptoms were "now biomechanical

or related to lesion in pre-tib area." (Tr. 250).  X-rays of the left tibia/fibula revealed fibrous

cortical defects in the distal femur, one demonstrating interval sclerosis since prior examination,

---

[4]Fibroma - A benign neoplasm derived from fibrous connective tissue. Id. at 724.

and was otherwise unremarkable. (Tr. 251). X-rays of the right tibia/fibula revealed a small area of benign appearing sclerosis in the posterior distal tibial metaphysis which was somewhat decreased in size when compared to the 2005 examination, likely resolving fibrous cortical defect or non-ossifying fibroma. (Tr. 253). Otherwise, the examination was unremarkable.

On February 21, 2009, Plaintiff complained to Summit Medical Center that she was having trouble breathing. (Tr. 261). A chest x-ray was negative. (Tr. 265).

On May 27, 2009, Plaintiff presented herself to St. Edward Mercy Clinic, where she was diagnosed with arthritis, bone lesions, and history of brain tumor. (Tr. 314).

On June 17, 2009, Dr. Ronald Crow, a non-examining consultant, completed a Case Analysis, wherein he concluded that the medical records supported non-severe physically. (Tr. 259).

On June 26, 2009, a report from St. Edward Mercy Clinic revealed that Plaintiff was doing much better, and the impression was asthma and arthralgia. (Tr. 312).

On August 19, 2009, a Mental Diagnostic Evaluation was conducted by Diane Brandmiller, Ph.D. - Psychologist. (Tr. 270-276). Dr. Brandmiller concluded that Plaintiff did not appear to currently meet the criteria for ADD. (Tr. 274). She diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Depressive Disorder Not Otherwise Specified |
| Axis II: | No diagnosis on Axis II |
| Axis V: | 51-60 |

(Tr. 274). Dr. Brandmiller discussed Plaintiff's daily activities, noting that she cleaned house, washed dishes, did laundry, mopped, and ate two meals a day. (Tr. 274). In addition, Plaintiff fed and bathed three dogs and fed a fish, went shopping about twice a month with her mother, was able to drive alone, read about one book a month, enjoyed playing basketball and soccer

-6-

with her brother and sister, showered twice a day, interacted in a socially appropriate manner, was likely to have adequate interpersonal relations with supervisors and coworkers, appeared able to communicate in a clear and effective manner, appeared able to understand, remember, and carry out simple instructions, may need reminders to follow through with tasks in a work setting, and appeared able to attend and sustain concentration and to sustain persistence on completing tasks. (Tr. 274-275).

On August 30, 2009, Brad F. Williams, a non-examining consultant, completed a Psychiatric Review Technique form. (Tr. 280-292). He found Plaintiff had a mild degree of limitation in restriction of activities of daily living and in difficulties in maintaining social functioning, a moderate degree of limitation in difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. 290). In a Mental RFC Assessment of the same date, Brad Williams found Plaintiff to be moderately limited in seven categories and not significantly limited in thirteen categories. (Tr. 294). He concluded that Plaintiff appeared capable of at least unskilled work activity. (Tr. 296).

On September 3, 2009, Plaintiff presented herself to St. Edward Mercy Medical Center with complaints of chest pain palpitations. (Tr. 599). Plaintiff was diagnosed with tachycardia,[5] with no malignant arrhythmias present, and a very benign and normal Holter. (Tr. 601).

Beginning on February 11, 2002, and up through September 17, 2010, Plaintiff was seen at Ennen Eye Center. She first visited them in 2002, when she experienced migraine headaches. (Tr. 423). In 2007, Plaintiff complained of blurred vision, and when she received new glasses, her vision was better. (Tr. 416). She was also assessed in 2007 and 2008 with Plaquinel use and

---

[5]Tachycardia - Rapid beating of the heart, conventionally applied to rates over 90 beats per minute. Id. at 1931.

a history of brain tumor. (Tr. 413, 415). On September 4, 2009, Plaintiff was assessed by Ennen Eye Group with Plaquinel Therapy, RA., history of brain tumor, and myopia/astig. (Tr. 411). On July 12, 2010, Plaintiff was assessed with "Ref error ou" and history of Plaquenil with no "toxicity ou." (Tr. 410). On September 17, 2010, Plaintiff was assessed by Ennen Eye Group with diplopia,[6] secondary to 6th nerve palsy. (Tr. 409).

A pulmonary function report conducted on September 18, 2009, showed Plaintiff had mild restrictive dysfunction, with no airflow obstruction, and a mild decrease in diffusion capacity. (Tr. 332).

On October 12, 2009, Plaintiff presented to St. Edward Mercy Clinic, complaining that Topamax made her feel jittery and that she was depressed over her situation. (Tr. 307). She was diagnosed with depression, migraines, seizure disorder, and vitamin D insufficiency. (Tr. 308). On October 23, 2009, Plaintiff was diagnosed with influenza A and asthmatic bronchitis at St. Edward Mercy Clinic. (Tr. 306, 691).

On November 12, 2009, Plaintiff presented to St. Edward Mercy Clinic, and it was reported that she needed a rheumatology evaluation. (Tr. 303). The impression given was: asthma, arthritis, and depression. (Tr. 304).

On December 1, 2009, Plaintiff was seen by Dr. Jon M. Gustafson at the Sparks Neurology Center at the request of Stephanie Ellis, APN. (Tr. 360-361). Dr. Gustafson noted that Plaintiff indicated she was having seizure episodes which were characterized by staring spells without convulsion, which occurred at a frequency varying from 1 to 4 per month. (Tr. 360). He also noted that she had some episodes of tremulousness, which might occur with the

---

[6]Diplopia - The condition in which a single object is perceived as two objects. SYN double vision. Id. at 547.

-8-

seizures. Plaintiff was instructed not to drive. (Tr. 360). He diagnosed her as follows:

> 1. Pineal cytoma resected December 2002
> 2. Migraine syndrome
> 3. Seizures manifesting clinically as staring spells. Further classification uncertain.

(Tr. 361).

On December 14, 2009, Plaintiff presented to St. Edward Mercy Clinic, where it was reported that she did not go to her pulmonalogy appointment. (Tr. 301). The impression given at that time was depression, headaches, seizure disorder, and asthma. (Tr. 302).  On December 17, 2009, a normal EEG was recorded and no abnormal paroxysmal discharges were seen. (Tr. 367).

On December 22, 2009, Plaintiff presented to the emergency room complaining of an anxiety attack and was diagnosed with acute anxiety. (Tr. 344).  X-rays of Plaintiff chest revealed no active cardiac or pulmonary disease. (Tr. 328).

On January 12, 2010, Plaintiff presented to St. Edward Mercy Clinic complaining that she felt like she was needing to care for everyone and was very anxious if away from home. (Tr. 503). She reported that Zoloft was helping her with depression. (Tr. 503). The impression given was anxiety and asthma. (Tr. 504).  On January 21, 2010, Plaintiff reported to St. Edward Mercy Clinic that she had no more anxiety attacks and was doing better. (Tr. 501).

On January 26, 2010, Plaintiff was seen by Dr. Elizabeth B. Russell, at the UAMS Rheumatology Clinic. (Tr. 370-373).  She reported having pain in her joints - mostly knees and ankles. (Tr. 370). Plaintiff reported that she ambulated without difficulty, had a steady gait, adequate joint function and joint stiffness. (Tr. 370). She reported being independent in her

AO72A
(Rev. 8/82)

bathing, dressing, grooming, feeding, and ambulation. (Tr. 371). Plaintiff reported that prolonged

walking hurt her ankles, and forceful gripping her "MCP and PIP joints." (Tr. 371). She also

noted numbness in her feet off and on. (Tr. 371). As Plaintiff was too old to go to Pediatric

Rheumatology department, she wanted to establish care at UAMS.  The impression given was:

> 1. Hx JRA and some evidence on Pe that would be compatible.
> No clear evidence activity now but I would like to repeat lab and
> consider x-rays also.
> 2. Hx pineal tumor with FH pos pituitary tumor and pt has hypothyroidism; r/o
> MEN1 syndrome. To see geneticist. Will order CA to screen for
> hyperparathyroidism.
> 3. Hypermobility: may be contributing to her arthralgias; discussed.
> 4. Anxiety, depression
> 5. Asthma, fair control by hx
> 6. Seizures, post op? PMD Rx
> 7. Hypothyroidism
> 8. Cortical bone defects tibias...?etiology

(Tr. 373).

On February 16, 2010, Cheryl Woodson-Johnson, Psy.D., completed a Case Analysis,

wherein she concluded that Plaintiff had not made any allegations of worsening, had not

provided any new sources, or made any new allegations. (Tr. 393). Accordingly, after reviewing

the file, she affirmed the determination dated August 30, 2009. (Tr. 393).

On February 22, 2010, a Physical RFC Assessment was completed by non-examining

consultant, Dr. Jerry Thomas. (Tr. 385-389). Dr. Thomas found Plaintiff was capable of

performing sedentary work with no postural, manipulative, visual, communicative or

environmental limitations. (Tr. 386-389).

In February, March, and April of 2010, Plaintiff presented herself to St. Edward Mercy

Clinic, complaining of ear and chest pain and sore throat; depression and fatigue, and impacted

-10-

teeth, respectively. (Tr. 495-500, 591-592).

On May 6, 2010, Plaintiff was seen by Dr. Gustafson at Sparks Neurology Center, for her migraine headaches. (Tr. 430). Dr. Gustafson reported that Plaintiff's headaches persisted, about 2 per week. (Tr. 430). His impression was: pineal cyst resection, stable on surveillance MRI, and migraine headaches. (Tr. 430).

In May of 2010, Plaintiff was seen at St. Edward Mercy Clinic and was noted to have low B12 level, fatigue, depression, and chronic migraines. (Tr. 493). On June 18, 2010, Plaintiff presented to St. Edward Mercy Clinic, complaining of cough congestion, and the impression was acute asthmatic bronchitis, arthralgia, and depression. (Tr. 491). Plaintiff reported to St. Edward Mercy Clinic on July 20, 2010, that she was hurting all over, and the impression given was arthralgia and vitamin D insufficiency. (Tr. 489).

Plaintiff saw Dr. Gustafson again on August 10, 2010, and reported that her headaches were quite a bit better, and she was planning on going back to school that year. (Tr. 428).

On August 18, 2010, Plaintiff saw Stephanie Ellis, APN, who noted Plaintiff had much decreased fatigue and that her depression was controlled. (Tr. 486).

On September 21, 2010, Plaintiff reported to St. Edward Mercy Clinic that she had runny diarrhea and epigastric pain. (Tr. 484). The impression given was malaise, reflux, epigastric pain, and diarrhea. (Tr. 485).

On October 5, 2010, Plaintiff presented herself to St. Edward Mercy Clinic, complaining that she continued to hurt in the epigastric area. She reported doing better on Nexium than any other medications. (Tr. 505). Associated symptoms included abdominal pain and headaches. (Tr. 505). Plaintiff also reported an abscess on her torso and trunk, characterized by redness,

-11-

painfulness, draining and swelling. (Tr. 505). Plaintiff was reported as negative for myalgias and

positive for headaches and depression. (Tr. 506). Plaintiff had normal range of motion and

normal mood and affect. (Tr. 506). Plaintiff was assessed as follows:

> 1. Hypothyroidism
> 2. Abdominal pain, generalized
> 3. Malaise and fatigue
> 4. Esophageal reflux
> 5. Arthralgia
> 6. Depression, major.

(Tr. 506).

On October 26, 2010, Plaintiff's migraine headaches were reported as stable. (Tr. 627).

She also had normal musculature, no joint deformities or abnormalities, normal range of motion

for all four extremities, head/neck, and spine. (Tr. 628).  Plaintiff was reported as having no

difficulty with ambulation and was able to perform activities of daily living. (Tr. 628). She was

assessed with common migraine, ADD, and diplopia. (Tr. 628).

On November 16, 2010, an EGD with biopsies was performed because of Plaintiff's

nausea. (Tr. 448, 458). The impression was Patulous[7] gastroesophageal junction, "causing Los

Angeles grade A," which is mild, esophagitis in the distal 3 cm of the esophagus. (Tr. 458). In

the Addendum, the pathology results revealed rapid urease[8] screening was positive and

esophageal biopsy revealed benign squamous mucosa with no inflammation. (Tr. 458).

A report dated November 18, 2010, from St. Edward Mercy Clinic indicates that Plaintiff

went in for follow-up on her GERD.  (Tr. 512). It was noted that Plaintiff's depression continued

---

[7]Patulous - to lie open. Id. at 1444.

[8]Urease - An enzyme that catalyzes the hydrolysis of urea to carbon dioxide and ammonia; used as an antitumor
enzyme; it is present in intestinal bacteria and accounts for most of the ammonia generated from urea in
mammals. Id. at 2171.

but was "holding ok."  (Tr. 512). Plaintiff was positive for myalgias and joint pain and depression. (Tr. 513). She had normal range of motion, and was assessed as follows:

> 1. GERD
> 2. Acute sinusitis
> 3. Depression

(Tr. 513).  On December 3, 2010, a Gastric Emptying Study was performed, and revealed a decreased gastric emptying, consistent with gastroparesis.[9] (Tr. 582).

On December 9, 2010, Stephanie Ellis, APN, completed an Attending Physician's Statement, wherein she reported that Plaintiff had headaches weekly, triggered by anxiety/tension, sinusitis, bright lights, history of head injury/brain surgery, vigorous exercise, lack of sleep, and weather change. (Tr. 521). She also reported that Plaintiff's headaches were also associated with vertigo, nausea/vomiting, malaise, visual disturbance, mood changes, and photosensitivity. (Tr. 521).

On January 4, 2011, Plaintiff presented to the Sparks Neurology Center, with migraines, disability application, MRI review, academic issues and diplopia. (Tr. 630). It was reported that Plaintiff's migraines had gotten a little better, and that her current migraine frequency was two per month. (Tr. 630).  Plaintiff was complaining of double vision, which is why a MRI was ordered. (Tr. 630). Plaintiff was negative for bone/joint symptoms and muscle weakness. (Tr. 632). The assessment was:

> Common migraine
> ADD
> Diplopia
> Occupational circumstances
> Academic problem

---

[9]Gastroparesis - Weakness of gastric peristalsis, which results I delayed emptying of the bowels. Id. at 793.

(Tr. 632).

On January 4, 2011, Dr. Gustafson completed an Attending Physician's Statement. (Tr. 523). He found Plaintiff had headaches twice per month which were triggered by anxiety/tension, sinusitis, migraine, bright lights, lack of sleep, noise, history of head injury/surgery, intracranial infection or tumor, and weather change. (Tr. 523). He also found Plaintiff's headaches were also associated with vertigo, nausea/vomiting, malaise, visual disturbance, mood changes, and photosensitivity. (Tr. 523).

On April 1, 2011, Dr. Jeff Snow conducted another neuropsychological evaluation. (Tr. 563-567). He noted there had been no tumor recurrence, and that Plaintiff was taking a number of different medications to address allergies, asthma, and arthritis. (Tr. 563). He reported she took Zoloft regularly and Xanax as needed for anxiety, and that she did not have noticeable problems with attention, but was sometimes impulsive in giving responses. (Tr. 563). He reported Plaintiff's gait pattern was normal with no indications of balance or coordination problems, and that with respect to upper extremities, there was no evident tremors or motor overflow on output tasks. (Tr. 564). He found test results showed that Plaintiff's intellectual abilities were within the low average range and that her verbal reasoning skills had remained stable, but she was somewhat lower with nonverbal reasoning. (Tr. 564). Plaintiff had equivalent timed performance with her dominant left and non-dominant right hands and there were no indications of any difficulties with fine motor control. (Tr. 564). Dr. Snow also reported that Plaintiff had good development of basic visual-perceptual skills including visual matching and visual discrimination. (Tr. 565). He found she was mildly impaired with visual-spatial processing and had difficulties with motor planning and output skills. (Tr. 565). Dr. Snow concluded that

-14-

Plaintiff's neurocognitive profile provided data supporting a diagnoses of Cognitive Disorder, nos, and that her profile had remained stable when compared to previous testing. (Tr. 567).

On April 13, 2011, Plaintiff presented to Sparks Neurology Center, complaining of migraine, diplopia, ADD, occupational circumstances and academic problems. (Tr. 634). She was negative for gait disturbance, psychiatric symptoms, and for bone/joint symptoms and muscle weakness. (Tr. 634-635).

## III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v.

-15-

Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A),

1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3),

1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for

at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation

process to each claim for disability benefits: (1) whether the claimant had engaged in substantial

gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled

an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing

past relevant work; and (5) whether the claimant was able to perform other work in the national

economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience

in light of her residual functional capacity (RFC). See McCoy v. Schweiker, 683 F.2d 1138,

1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**IV.   Discussion:**

Plaintiff makes the following arguments on appeal: 1) The ALJ erred as to the RFC; 2)

The ALJ erred as to credibility; and 3) The ALJ failed to fully develop the record. (Doc. 12).

**A.     RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R.

§404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes

-16-

medical records, observations of treating physicians and others, and the claimant's own description of her limitations. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005); <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. <u>Lewis v. Barnhart</u>, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." <u>Id</u>.

In the present case, the ALJ found that since September 1, 2009, Plaintiff had the RFC to perform sedentary work with certain limitations. (Tr. 15). In making this finding, the ALJ considered all of the medical records. He also discussed the physicians' opinions. For example, he discussed the findings of Dr. Richard W. Nicholas, an orthopedist, Dr. Elizabeth B. Russell, a rheumatologist, Dr. Jon M. Gustafson, a neurologist, the treating physicians at St. Edward Mercy Clinic, Stephanie Ellis, APN, Dr. Jerry Thomas, Dr. Jeff Snow, Dr. Brandmiller, and the state agency psychological consultants. (Tr. 15-19). The ALJ also considered Plaintiff's own description of her limitations. (Tr. 16-18).

Plaintiff argues that the RFC does not account for frequent breaks Plaintiff would have to take due to pain or residual side affects of the frequent migraines, nor the nature and extent of her depression, Plaintiff's fatigue, or needing to rest daily. Plaintiff also contends that the ALJ did not give enough weight to the treating physicians, or the fact that Plaintiff had continued

-17-

difficulties with attention and concentration.

The ALJ gave the opinions of Stephanie Ellis, APN, and Dr. Gustafson "some credit" and took them into account by finding that Plaintiff must avoid all exposure to hazards, including driving as a part of work, and by finding that Plaintiff must avoid even moderate exposure to temperature extremes, humidity and other pulmonary irritants. (Tr. 17). The ALJ gave the opinion of Dr. Thomas, a state agency medical consultant, "great weight" regarding Plaintiff's exertional limitations, believing it to be consistent with the evidence as a whole. (Tr. 18). The ALJ considered Dr. Snow's 2008 and 2011 opinions, noting that he diagnosed Plaintiff with cognitive disorder, and that Plaintiff's profile had remained stable since he saw her in 2008. (Tr. 18). The ALJ noted that Dr. Snow did not say that Plaintiff could not attend college or that her problems would prevent her from performing basic work activities within the assessed RFC. (Tr. 18). The ALJ gave Dr. Brandmiller's opinion "substantial weight," noting that it was consistent with Dr. Snow's report and with the other medical evidence. (Tr. 19). The ALJ also gave the opinion of Dr. Snow, as well as Plaintiff's treating physicians, substantial weight. (Tr. 19).

The undersigned believes there is substantial evidence to support the weight the ALJ gave to the various opinions, and that the RFC provides for the limitations that are supported by the evidence as a whole.

### B.    Credibility Findings:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional

-18-

restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8ᵗʰ Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8ᵗʰ Cir. 2003).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 17).  The ALJ considered the medical evidence, and noted that although Plaintiff complained of having one or two headaches a week, a January 4, 2011 report from Dr. Gustafson indicated that Plaintiff reported having two headaches per month. (Tr. 17). In addition, in an August 10, 2010 report from Dr. Gustafson, Plaintiff reported that her headaches were "quite a bit better." (Tr. 428).   The ALJ also noted that although Plaintiff needed reminders to take her medication, Plaintiff was able to clean house, wash dishes, do laundry and mop. (Tr. 13).  In her Function Report dated May 21, 2009, Plaintiff reported she went to school from 8 until 3, took a nap when she got home, ate supper, did homework, and fed and bathed her pets, with the help from her mom and siblings. (Tr. 174-175). She also reported she went outside daily, walked, drove a car, and shopped in stores for groceries and "junk food." (Tr. 177).

The ALJ properly considered the Polaski factors, and the undersigned believes there is substantial evidence to support the ALJ's credibility findings.

-19-

C.      **Failure to Fully Develop the Record:**

The ALJ has a duty to fully and fairly develop the record.  See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995);   Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000).   This is particularly true when Plaintiff is not represented by counsel.  Payton v. Shalala, 25 FG.3d 684, 686 (8th Cir. 1994).   This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary.  See 20 C.F.R. § 404.1512.  The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).   However, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record.  See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").   "The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment.   They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."   Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 989).

Plaintiff argues that the ALJ should have further developed the record so the extent of her mental impairments would be clear, and in order to make a determination that the depression and mental impairments were in fact severe.   The Court disagrees.   The ALJ had before him the records regarding Plaintiff's mental impairments from Dr. Diane Brandmiller, non-examining consultant Brad F. Williams, Cheryl Woodson-Johnson, Psy.D., and Dr. Jeff Snow.   Those medical records contain sufficient evidence for the ALJ to make a determination.

Based upon the foregoing, the Court believes there is sufficient evidence to support the

-20-

fact that the ALJ fully and fairly developed the record.

**IV.    Conclusion:**

Accordingly, the Court recommends affirming the ALJ's decision, that as of September 1, 2009, Plaintiff was not disabled, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of December, 2013.

*/s/ Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-21-